JOHN C. SIMPSON and LORI SIMPSON,
     Plaintiffs,

    v.          CAUSE NO.: 1:14-CV-345-TLS

GENERAL DYNAMICS ORDNANCE AND
TACTICAL SYSTEMS–SIMUNITION
OPERATIONS, INC.,
     Defendant.

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [ECF No. 34] and on a Motion to Strike [ECF No. 43], both filed by Defendant General Dynamics Ordnance and Tactical Systems–Simunition Operations, Inc. Plaintiffs John C. Simpson and Lori Simpson bring this lawsuit under the Indiana Products Liability Act (IPLA) to recover for injuries Mr. Simpson sustained to his elbow and arm when he was hit by a Simunition 9mm marking cartridge during a training exercise. Plaintiffs allege that the Simunition round was in a defective condition unreasonably dangerous because of a manufacturing defect, a design defect, and a failure to warn. In the motion for summary judgment, Defendant argues that the opinion of Plaintiffs' expert witness does not support any of these theories under the IPLA. Finding that Plaintiffs have offered evidence sufficient to create a genuine issue of material fact for trial based on theories of manufacturing defect and failure to warn, the Court GRANTS in part and DENIES in part the Motion for Summary Judgment. The Court also DENIES the Motion to Strike.

## PROCEDURAL BACKGROUND

Plaintiffs filed a Complaint [ECF No. 3] in the Allen County, Indiana, Superior Court, alleging claims of strict product liability under the Indiana Product Liability Act (Count I),

negligence (Count II), and loss of consortium (Count III). Defendant removed the case to this Court based on diversity jurisdiction, 28 U.S.C. §§ 1332, 1441 [ECF No. 1], and filed an Answer [ECF No. 5]. After discovery, defendant then filed the instant Motion for Summary Judgment [ECF No. 34], Plaintiffs filed a Brief in Opposition [ECF No. 38], and Defendant filed a Reply in Support [ECF No. 42]. Defendant also filed a Motion to Strike [ECF No. 43], to which Plaintiffs filed a Response [ECF No. 45]. Defendant has not filed a reply in support of the Motion to Strike, and the time to do so has passed. Following a June 16, 2019 telephonic status conference, the parties filed supplements to the briefing on summary judgment [ECF Nos. 52, 53].

## MOTION TO STRIKE

Defendant asks the Court to strike the affidavit of Plaintiffs' expert, John Nixon [ECF No. 38-9], which was filed in support of Plaintiffs' summary judgment response brief. Defendant argues that the affidavit constitutes a new expert opinion that is untimely because it was filed more than three months after the close of expert discovery and after Defendant filed its motion for summary judgment. Expert witnesses must prepare and sign a written report containing a complete statement of all opinions to be expressed. Fed. R. Civ. P. 26(a)(2)(B). Any additions or changes to the report necessary for the complete disclosure of the expert opinion must take place before the deadline for pretrial disclosures under Rule 26(a)(3). Fed. R. Civ. P. 26(e)(2). However, the duty to supplement cannot be used to disclose an entirely new expert opinion. *Vill. of Sauk Vill. v. Roadway Express, Inc.*, No. 15-CV-9183, 2017 WL 378424, at *2 (N.D. Ill. Jan. 25, 2017). If a party does not timely file the report, the court may exclude the expert from testifying at trial on the matters the party was required to disclose. Fed. R. Civ. P. 37(c)(1); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000). The sanction of exclusion is "'automatic and mandatory unless the party to be sanctioned can show that its violation of

Rule 26(a) was either justified or harmless.'" *NutraSweet*, 227 F.3d at 785–86 (quoting *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)). Four factors guide a court's analysis of whether to exclude the testimony: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Mr. Nixon's affidavit contains new opinions regarding products that are readily available on the market and that would not cause injury. Pls.' Br. Opp'n to Summ. J., Ex. 8 (Nixon Aff.), ¶ 4, ECF No. 38-9. Defendant contends that Mr. Nixon had this information at the time of his original and rebuttal opinions and argues that it is prejudiced by the disclosure after the close of discovery. Plaintiffs respond that any prejudice was cured by Defendant sufficiently rebutting the new opinion in its summary judgment reply brief. Although the affidavit contains an untimely, new opinion, the Court finds no prejudice because Defendant persuasively argues in its summary judgment reply brief that Mr. Nixon's new opinion does not save Plaintiffs' design defect claim. The Court denies the motion to strike.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has explained that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial."

*Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017).

## FACTUAL BACKGROUND

**A.      The Simunition 9mm Marking Cartridges**

Simunition 9mm FX marking cartridges are manufactured by Defendant General Dynamics Ordnance and Tactical Systems–Simunition Operations, Inc. *See* Def.'s Mot. Summ. J., Ex. B (Nixon Report), pp. 1, 16–17, ECF No. 34-2. Simunition rounds are marking cartridges that look similar to bullets and leave a colored mark on the target. Def.'s Mot. Summ. J., Ex. C (Simpson Dep.), 82:5–83:13, ECF No. 34-3. The Simunition rounds are not fired from a regular weapon but rather from a blue replica 9mm Glock. *Id.* 27:16–24.

The Simunition "Scenario Instructor & Safety Certification Course: Student Guide" contains a "Requirements for Safety and Use" section, which provides, in relevant part:

> If projectiles are to be potentially shot at human targets, Full face, throat and groin protection for all persons in the *safe zone* is <u>MANDATORY</u>. . . . Full body covering to include the use of gloves and hard athletic-cup style groin protection are HIGHLY RECOMMENDED. Shots to exposed skin are STRONGLY DISCOURAGED. Hits may sting causing welts, scrapes or bruises, or breaking of the skin.

Pls.' Br. Opp'n Summ. J., Ex. 2 (Training Manual), p. 3, ECF No. 38-3. Defendant provides a separate set of warnings and instructions with its Simunition marking cartridges, which provide, in pertinent part:

| | |
|---|---|
| Lethality | Non-lethal bruises, welts or scraps |
| . . . . | |
| Mandatory safety equipment | Head, throat and groin protection |
| . . . . | |

- Simunition recommends a minimum 1-ft. (30 cm) stand-off distance when firing 9mm . . . FX Marking Cartridges at protected personnel

- Users must wear approved FX protective gear (head, throat and groin protection). Full-body covering recommended

Nixon Report 17, Ex. D (Simunition Information Sheet).

**B.      Mr. Simpson's Background and Injury**

At the time of briefing, Mr. Simpson was 49 years old and a twenty-year veteran of the United States Marshals Service, working in the Northern District of Indiana in Fort Wayne, Indiana, since 2007. Def.'s Mot. Summ. J., Ex. C (Simpson Dep.) 6:3–4, 14:18–15:17, ECF No. 34-3. When Mr. Simpson became a Deputy Marshal in 2002, he received training that included scenarios in which Simunition rounds were used. *Id*. 18:7–11, 19:15–23.

During those training scenarios, Mr. Simpson wore protective gear that protected the head, throat, and groin areas of his body, and he wore a parka jacket to cover his arms and possibly a piece of something to cover his chest. *Id.* 20:17–21:5. During these training scenarios, Mr. Simpson was hit with Simunition rounds more than fifty times, including hits to the arm. *Id.* 55:22–56:4, 56:17–2. He described the hits as hurting a little more than getting hit with a paintball and sometimes leaving a welt on his body. *Id.* 21:6–16, 56:17–57:2. However, he never experienced anything more serious than that. *Id.* 57:3–6. He also understood that getting hit in the eye, face, throat, or groin with a Simunition round could cause serious injury. *Id.* 73:12–74:15. Since transferring to Fort Wayne in 2007, Mr. Simpson has had additional training as a Deputy Marshal during which Simunition rounds were used. *Id.* 40:14–17, 43:18–44:25. At the time of the October 1, 2012 incident that is the subject of this lawsuit, Mr. Simpson was in Chicago for what he described as "HFRA" or "high intense fugitive apprehension training." *Id.* 40:20–42:15.

On October 1, 2012, the first day of training, Mr. Simpson and the other U.S. Marshals were using Simunition rounds and blue Glock replica guns provided by U.S. Marshals Service.

*Id.* 78:9–14. The Glock 17 model pistol used by Mr. Simpson is not made by Defendant; it is made by Glock. Def.'s Mot. Summ. J., Ex. A (Aff. de Sousa), ECF No. 34-1. Mr. Simpson was wearing head, throat, and groin protection as well as a vest, all of which was provided by the U.S. Marshals Service. Simpson Dep. 73:12–22. Mr. Simpson was also wearing a long sleeve nylon shirt. *Id.* 69:14–18. Before the training scenario, a crate with ten guns was brought out and each participant took a gun and loaded it in preparation for the scenario. *Id.* 78:18–79:6.

During the training scenario, Mr. Simpson and his partner had just knocked on a door when someone behind Mr. Simpson slid open a window and fired Simunition rounds into his back. *Id.* 58:9–12. He was hit in the arm and leg, possibly the vest, and his right elbow. *Id.* 59:24–60:5, 60:16–61:2. At the time he was hit in the elbow, Mr. Simpson felt what he described as excruciating pain, and his right hand had a stinging sensation. *Id.* 59:25–60:5. He turned to return fire and was able to complete the training scenario. *Id.* 60:8–12, 61:22–62:2, 97:3–7. After the training scenario, the pain in Mr. Simpson's right elbow and arm continued, so much so that he told his training partner about it. *Id.* 60:12–15. After the scenario was over, Mr. Simpson noticed that he had residue on his shirt where the round had struck his elbow, and there was a welt or raised bruise above his elbow, at the bottom of his right tricep. *Id.* 62:15–63:6, 76:6–15. The impact did not break the skin. *Id.* 63:7–8. Mr. Simpson continued to participate in training that day and the rest of the week with his arm "having the same sensation." *Id.* 96:12–21.

The following week, he sought medical attention because his arm started to get a bruise that was moving from his wrist up to his armpit area and his arm started to swell. *Id.* 96:22–97:7. Mr. Simpson's primary care physician referred him to orthopedic specialist Dr. Steven Eddy with Fort Wayne Orthopedics. *Id.* 97:12–24. Dr. Eddy examined Mr. Simpson, performed x-rays and an MRI, and determined that Mr. Simpson had suffered a detached tricep. *Id.* 97:25–98:14.

At Dr. Eddy's recommendation, on November 14, 2012, Mr. Simpson underwent surgery, which was successful in reattaching the tricep to the bone. *Id.* 98:15–99:3. However, the surgery did not correct the pain, stinging and numbness in his ring and pinky finger, the loss of use of his thumb, or the loss of strength in his hand. *Id.* 99:12–102:1. These problems continued, and Mr. Simpson had a second surgery on July 31, 2013, described by Dr. Eddy to Mr. Simpson as a right ulnar nerve release at the elbow. *Id.* 102:9–103:25. Mr. Simpson experienced no improvement with the second surgery. *Id.* 103:24–25. Approximately seven months later, Dr. Eddy performed a third surgery described as a right ulnar nerve transposition at the elbow. *Id.* 104:1–15. That surgery was also unsuccessful as was the recommended post-operative physical therapy, which Mr. Simpson completed. *Id.* 104:16–25. Dr. Eddy referred Mr. Simpson to his colleague, Dr. Niles Schwartz, a hand specialist. *Id.* 105:1–14. Mr. Simpson has also seen Dr. Mark Reecer who did some EMG studies and concluded that Mr. Simpson suffered from chronic right ulnar neuropathy at the elbow. *Id.* 105:15–106:15.

Mr. Simpson's condition has not improved, and he continues to suffer from atrophy in his right hand and problems with his index and pinky fingers, the nerves on top of his finger, and the webbing in his thumb. *Id.* 106:5–107:17. Dr. Eddy opined in his expert report: "I do believe that his injuries to the elbow were a direct result of his job training with US Marshals and the ballistics injury to his right elbow." Pls.' Br. Opp'n Summ. J., Ex. 3, ECF No. 38.

**C.      John Nixon's Expert Opinions as to Liability**

John Nixon, Plaintiffs' expert witness on ballistics, provided an expert report on January 4, 2016, a rebuttal report on May 11, 2016, and deposition testimony on September 29, 2016. *See* Pl.'s Br. Opp'n Summ. J., Exs. 4, 6, 7, ECF Nos. 38-5, 38-7, 38-8. Mr. Nixon is an international ballistics expert who became Board Certified in forensic engineering in February 2016. Def.'s

Mot. Summ. J., Ex. 8 (Nixon Dep.) 8:1–10:14, ECF No. 34-8; Pls.' Br. Opp'n Summ. J., Ex. 5 (Nixon's Curriculum Vitae), ECF No. 38-6.

In preparing his opinion in this case, Mr. Nixon purchased a box of Simunition 9mm ammunition, dismantled two of the rounds, and did some weighing and measuring. Nixon Dep. 41:7–12. He measured the components, weighed them, and microscopically examined them. *Id.* 42:24–43:4. He also photographed the rounds, which, except perhaps for the color, were the same as the rounds used in the training scenario on October 1, 2012. *Id.* 44:1–45:1. The round Mr. Nixon tested for propellant contained a charge of .9 grains. *Id.* 45:13–46:1. This charge of .9 grains is three times the amount of the design specification for the charge, which was .3 grains. *Id.* 46:3–48:4; *see also* Training Manual p. 0TS000000079 ("In the 9mm cartridge there are .3 grains . . . of powder . . . .").

In his deposition, Mr. Nixon explained that he did not have an opportunity to measure the amount of propellant in the round that struck Simpson's elbow because it was already fired and spent during the training event. Nixon Dep. 48:17–22, 102:19–24. He testified that, even if he had the evidence, because the propellant and the primer had been consumed, there would be no way to tell if there had been a propellant overcharge in that round. *Id.* 72:8–16. Mr. Nixon opined that, although the design specification is for .3 grains, there could have been more in the round based on his research. *Id.* 48:23–49:3. Mr. Nixon noted that Defendant's Training Manual admitted the possibility of an overcharge or overpowered cartridge: "An overpowered cartridge causes the sabot to separate from the cartridge case. Although this is the rarest type of stoppage, it is caused by variations in the primers or by too much powder in the case." Training Manual p. 0T000000073; *see also* Nixon Dep. 106:19–108:2. Mr. Nixon concluded that the Simunition

rounds "could have more energy than the stated energy due to overload conditions that may exist due to production variations." Nixon Dep. 37:15–25.

Mr. Nixon also concluded that the Simunition round, even if manufactured to specification, can cause serious injury. *Id.* 96:22–97:5. Yet, Mr. Nixon perceived the purpose of the Simunition 9mm marking cartridges as providing "force-on-force training without serious injury, hopefully." *Id.* 59:10–21. Mr. Nixon noted that the kinetic energy of the Simunition round was 2.2 to 4.1 foot pounds based on the test data provided by Defendant. *Id.* 66:1–67:14. He then concluded that this amount of kinetic energy can cause serious injury based on studies from the United Kingdom, Northern Ireland, and the United States. *Id.* 67:15–69:23. Mr. Nixon also noted that the kinetic energy quoted was for a range of 3.5 meters (11 feet 5.79 inches) and that Mr. Simpson indicated that he was shot from a distance of 5 to 6 feet. *Id.* 76:14–77:5. Mr. Nixon explained that the Simunition cartridges are lightweight and retard quickly, so the kinetic energy could be significantly more at a closer distance. *Id.* 77:6–14.

Regarding elbow protection, Mr. Nixon gave the following opinions:

> 9.9 The fact that Defendant markets a line of protective equipment, some of which is mandatory, indicates that they are aware that their product has significant wounding potential.

> 9.10 One item of protective clothing offered by the Defendant is elbow protection. Consequently, it can be concluded that Defendant recognizes that there is a danger of injury in the region of the elbow. Plaintiff placed trust in Defendant when he chose not to wear elbow protection, which was not mandatory. Plaintiff's trust was ill placed—elbow protection would have prevented this injury.

Pls.' Br. Opp'n Summ. J., Ex. 7 (Nixon Suppl. Report) ¶¶ 9.9, 9.10, Ex. 38-8. Having reviewed Defendant's Training Manual, Mr. Nixon noted that elbow protection is not required. Nixon Dep. 37:5–18; Training Manual p. 0TS000000070. After reviewing the separate warnings and instructions Defendant provided with the Simunition ammunition, Mr. Nixon concluded that

Defendant should have required elbow protection and that the warnings provided by Defendant were inadequate. Nixon Dep. 108:23–109:22.

Finally, in his affidavit submitted with Plaintiffs' response brief, Mr. Nixon explains that he had not previously given an opinion as to a cost-effective alternative design to the Simunition 9mm marking cartridge because other options that would not cause injury are readily available on the market. Nixon Aff. ¶ 4. As an example, he identified the Dvorak Tetherless Recoil System TRS-GL17 ("DTRS"), which is also used with a Glock 17, transmits a beam of light for each shot, registers the 'hit' location on an active target system, and simulates firearm recoil. *Id.* ¶ 5. Mr. Nixon stated that the DTRS is low cost relative to the number of rounds being fired and that, because no projectile impacts the target, there is no potential for any injury. *Id.* ¶¶ 6–7. He also identified FATS, which also simulates recoil and does not launch a projectile. *Id.* ¶ 8.

## ANALYSIS

Defendant seeks judgment in its favor on Plaintiffs' product liability claims and loss of consortium claim. Indiana law governs Plaintiffs' claims in this diversity action. *See Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 481 (7th Cir. 2018) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The parties agree that the Indiana Product Liability Act (IPLA) governs all of Plaintiffs' product liability claims, regardless of the legal theory upon which the action is brought. *See* Ind. Code § 34-20-1-1; *Piltch v. Ford Motor Co.*, 778 F.3d 628, 632 (7th Cir. 2015). As a derivative cause of action, Plaintiff Lori Simpson's loss of consortium claim is not subsumed by the IPLA. *See Wortman v. C.R. Bard, Inc.*, No. 1:19-CV-3273, 2019 WL 6329651, at *3 (S.D. Ind. Nov. 26, 2019).

The IPLA sets out the requirements for a product liability claim:

Except as provided in section 3 of this chapter, a person who sells, leases, or otherwise puts into the stream of commerce any product in a *defective condition*

*unreasonably dangerous* to any user or consumer . . . is subject to liability for physical harm caused by that product to the user or consumer . . . if:

> (1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;
>
> (2) the seller is engaged in the business of selling the product; and
>
> (3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is sold by the person sought to be held liable under this article.

Ind. Code § 34-20-2-1 (emphasis added); *see Brewer v. PACCAR, Inc.*, 124 N.E.3d 616, 621 (Ind. 2019). "A product may be defective under the IPLA if it is defectively designed, if it has a manufacturing flaw, or if it lacks adequate warnings about dangers associated with its use." *Brewer*, 124 N.E.3d at 621 (citing Ind. Code §§ 34-20-4-1 to -2; *Campbell Hausfeld/Scott Fetzer Co. v. Johnson*, 109 N.E.3d 953, 956 (Ind. 2018)).[1] "'The requirement that the product be in a defective condition focuses on the product itself while the requirement that the product be unreasonably dangerous focuses on the reasonable expectations of the consumer.'" *Heritage Operating, L.P. v. Mauck*, 37 N.E.3d 514, 523 (Ind. Ct. App. 2015) (quoting *Welch v. Scripto–Tokai Corp.*, 651 N.E.2d 810, 814 (Ind. Ct. App. 1995)).

Plaintiffs seek relief under all three theories of liability—manufacturing defect, design defect, and failure to warn. The parties agree that expert testimony is required on these issues.

---

[1] The IPLA defines "Products which are considered defective":
> A product is in a defective condition under this article if, at the time it is conveyed by the seller to another party, it is in a condition:
> (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and
> (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

Ind. Code § 34-20-4-1.

*See Piltch*, 778 F.3d at 632 ("[E]xpert testimony on an issue is required when the issue is not within the understanding of a lay person." (citing *Daub v. Daub*, 629 N.E.2d 873, 878 (Ind. Ct. App. 1994)). On summary judgment, Defendant's sole challenge to Plaintiffs' prima facie case is that the opinion of Plaintiff's expert, John Nixon, is insufficient to show that the Simunition 9mm marking cartridge was sold in a "defective condition unreasonably dangerous" to any user or consumer. The Court considers each basis of liability in turn.

## A.      Manufacturing Defect

A claim of manufacturing defect under the IPLA sounds in strict liability. *See* Ind. Code § 34-20-2-3. "A product contains a manufacturing defect when it deviates from its intended design." *Hathaway v. Cintas Corp. Servs., Inc.*, 903 F. Supp. 2d 669, 673–74 (N.D. Ind. 2012) (quoting *Westchester Fire Ins. Co. v. Am. Wood Fibers, Inc.*, No. 2:03-CV-178, 2006 WL 3147710, at *5 (N.D. Ind. Oct. 31, 2006)). Contrary to Defendant's argument, Plaintiffs have offered sufficient evidence from which a jury could reasonably infer that the Simunition 9mm marking cartridge that injured Mr. Simpson's arm deviated from its intended design based on Mr. Nixon's testimony regarding the potential for an overcharge of propellant.

In forming his opinion, Mr. Nixon purchased a box of Simunition 9mm marking cartridges and dismantled two cartridges. He then measured and weighed the propellant in one of them, finding that the cartridge contained a charge of .9 grains. Mr. Nixon testified that the charge of .9 grains is three times the .3 grains that Defendant's design specifications call for in the 9mm marking cartridge. Mr. Nixon testified that the more propellant or charge contained in a marking cartridge, the greater the wounding potential of the projectile. Nixon Dep. 72:17–21. Defendant acknowledges that an overcharge or a double charge could increase the kinetic energy of the projectile but contends that there is no evidence this occurred in this case. However, Mr.

Nixon testified that there is no way to know the quantity of propellant in the cartridge that injured Mr. Simpson "because the evidence has essentially been consumed." Nixon Dep., 72:11–16. When asked about the amount of propellant in the round that hit Mr. Simpson, Mr. Nixon testified that "the design specification is for .3 grains. Of course, we know it could have been more than that, too." *Id.* 49:1–3.

This is one of the "certain rare instances" under Indiana Law, in which "circumstantial evidence may produce reasonable inferences upon which a jury may reasonably find that a defendant manufactured a product containing a defect." *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1208 (7th Cir. 1995); *see also Torres v. Werner Co.*, No. 3:11-CV-479, 2014 WL 3579684, at *6 (N.D Ind. July 18, 2014); *Smith v. Ford Motor Co.*, 908 F. Supp. 590, 593 (N.D. Ind. 1995) ("'[D]irect evidence is not required if there is evidence from which a reasonable inference can be drawn as to a defect proximately causing the injury.'" (quoting *SCM Corp. v Letterer*, 448 N.E.2d 686, 691 (Ind. Ct. App. 1983))). "[A] plaintiff may use circumstantial evidence to establish that a manufacturing defect existed only when the plaintiff presents evidence by way of expert testimony, by way of negating other reasonably possible causes, or by way of some combination of the two." *Whitted*, 58 F.3d at 1209.

Mr. Nixon's testing and Defendant's Training Manual show that the Simunition 9mm marking cartridges can be overcharged and that, if they are overcharged, there will be more kinetic energy and a greater chance of inflicting injury. Also, Mr. Simpson's treating physician, Dr. Eddy, opined that the force of the cartridge was the cause of Mr. Simpson's injury. Notably, Defendant's expert stated that, if an overcharge or double charge occurs, a much louder than normal noise signature would occur and a sabot separation would occur; Defendant argues that there is no evidence of either a sabot separation or a much louder noise signature at the time of

Mr. Simpson's injury. *See* Aff. de Sousa 10. In contrast, Mr. Nixon explained that, if a sabot separation occurred, it is likely that no one would have noticed the noise or reported the incident. Nixon Suppl. Report 3. At a minimum, this is an issue of fact for the jury. Thus, although it is not possible to know the charge that was in the round that struck Mr. Simpson's elbow because the evidence was consumed, Plaintiffs have produced circumstantial evidence through expert testimony from which a jury could reasonably infer that the Simunition 9mm marking cartridge was overcharged and deviated from its intended design. Therefore, the Court denies the motion for summary judgment on Plaintiffs' manufacturing defect claim.

**B.      Design Defect**

"[I]n product liability claims alleging a product design defect, the [IPLA] substitutes a negligence standard for strict liability and prescribes the applicable standard of care." *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 214 (Ind. 2010) (citing Ind. Code § 34-20-2-2). More specifically, a plaintiff "'must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product.'" *Id*. (quoting Ind. Code. § 34-20-2-2). Thus, to succeed on a design defect claim, a plaintiff must establish that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; and (3) the breach proximately caused an injury to the plaintiff. *Brewer*, 124 N.E.3d at 621 (citing Ind. Code § 34-20-2-2; *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007)).

Plaintiffs' design defect claim fails because Plaintiffs' expert does not offer an opinion that the velocity of the Simunition 9mm marking cartridge was negligently designed. Plaintiffs are correct that Mr. Nixon's report states that, according to Defendants' materials, the kinetic energy of the Simunition 9mm marking cartridge was 2.2 to 4.1 foot pounds at a range of approximately eleven and a half feet, that the Training Manual provided with the Simunition

9mm marking cartridges recommends a stand-off distance of only one foot, that Mr. Simpson believes that he was shot from a distance of five to six feet, and that the Simunition Information Sheet indicates that "improper use can cause serious injury." Nixon Report § 6, Table 1. However, Mr. Nixon does not draw any conclusions from these stated facts and does not opine that Defendant did not exercise reasonable care in designing the Simunition 9mm marking cartridge. In fact, Mr. Nixon testified that he did not opine in his report that the rounds were negligently designed. Nixon Dep. 102:25–103:8. Thus, Plaintiffs have not offered evidence to create a question of fact as to design defect, and summary judgment in favor of Defendant is proper on this claim.

In further support of this claim, Plaintiffs offer the affidavit of Mr. Nixon, drafted in support of their summary judgment response brief (and the subject of the Motion to Strike), in which Mr. Nixon states that "there are other options [in comparison with the Simunition 9mm marking cartridge] that are readily available on the market that would not cause injury." Nixon Aff. ¶ 4. Both parties in this case argue that a plaintiff bringing a design defect claim must show that an alternative design could have prevented the injury and was cost-effective under general negligence principles. *See* Def.'s Mem. Supp. Summ. J. 11, ECF No. 35; Pls.' Br. Opp'n Summ. J. 16; *see also Aregood*, 904 F.3d at 488 (quoting *Piltch*, 778 F.3d at 632 (quoting *Pries v. Honda Motor Co.*, 31 F.3d 543, 545–46 (7th Cir. 1994))); *Weigle v. SPX Corp.*, 729 F.3d 724, 734 (7th Cir. 2013).

It is unclear whether this common law requirement remains applicable following the 1995 amendment to the IPLA that imposed the negligence standard for design defect claims as set out in Indiana Code § 34-20-2-2. In *TRW Vehicle Safety Systems v. Moore*, the Indiana Supreme Court held in 2010 that the IPLA "prescribes the applicable standard of care" for design

defect claims, quoting the statute, and further held: "We decline to require any additional or more particular standard of care in product liability actions alleging a design defect." 936 N.E.2d at 209; *see also Brewer*, 124 N.E.3d at 621 (citing the ILPA for the standard for a design defect claim with no discussion of a requirement that a plaintiff prove a cost-effective safer alternative design); *Kaiser v. Johnson & Johnson*, No. 2:17-CV-114, 2018 WL 739871, at *3–6 (N.D. Ind. Feb. 7, 2018) (detailing the history of the cost-effective alternative design requirement under the common law prior to the 1995 amendment to the IPLA, discussing the Indiana Supreme Court decision in *TRW*, and finding that "proof of a safer alternative design is not a prima facie requirement of [a design defect] case" but is probative of the issue of failure to use reasonable care); *but see Weigle*, 729 F.3d at 734, 734 n.2 (requiring the plaintiff to demonstrate that the defendant failed "to take precautions that are less expensive than the net costs of accidents" and declining to decide whether the Indiana Supreme Court in *TWR* disapproved of the requirement).

Whether this showing remains an additional requirement for a design defect claim or is simply evidence probative of negligent design, Mr. Nixon's affidavit does not save Plaintiffs' design defect claim in this case. In the affidavit, Mr. Nixon indicates that there are other products already on the market that are cost-effective and would not cause injury, specifically identifying the Dvorak Tetherless Recoil System TRS-GL17 ("DTRS") and the "FATS" system. Nixon Aff. ¶¶ 5–8. First, Mr. Nixon does not offer a cost-benefit analysis of these systems other than the unsupported statement that the "DTRS allows for a large number of simulated rounds to be fired for a minimal cost." *Id*. ¶ 6. Second, the two systems do not constitute a "reasonably feasible alternative design" because they transmit laser beams and do not launch a projectile; thus, they are a different product from the Simunition 9mm marking cartridges. *Id*. ¶¶ 6, 8. Although he opines that both systems have no potential for injury, *id.* ¶¶ 6–8, Mr. Nixon offers no testimony

that these systems are a feasible alternative for use during an interactive tactical training session. The mere existence of a safer product is not sufficient to establish liability. *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 638 (7th Cir. 2006).

Accordingly, the Court grants summary judgment in favor of Defendant on Plaintiffs' design defect claim.

## C. Failure to Warn

A product is defective for a failure to warn if a seller fails to: "(1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer." Ind. Code § 34-20-4-2. As with design defect claims, failure to warn claims sound in negligence. *See* Ind. Code § 34-20-2-2; *Weigle*, 729 F.3d at 731. The duty to warn of "latent danger[s] inherent in the product's use" is a duty "to warn of the hidden danger itself, or the risks from a recognized danger that far exceed that contemplated by the ordinary consumer." *Aregood*, 904 F.3d at 482 (quoting *First Nat'l Bank & Tr. Corp. v. Am. Eurocopter Corp.*, 378 F.3d 682, 690 (7th Cir. 2004)). While "[t]he adequacy of warnings is classically a question of fact reserved to the trier of fact and, therefore, usually an inappropriate matter for summary judgment," *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1162 (Ind. Ct. App. 1988), "[t]he determination of whether a duty to warn exists is generally a question of law for the court to decide rather than one of fact," *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997).

"A manufacturer has a duty to warn with respect to latent dangerous characteristics of the product, even though there is no 'defect' in the product itself." *Id.* "A failure to warn of a latent danger will, without more, cause the product to be unreasonably dangerous as marketed." *Id.*

Defendant argues that Plaintiffs have not offered expert evidence that Defendant's failure to warn of a particular risk was negligent. However, Defendant had a duty to warn users of the dangers of the Simunition 9mm marking cartridge. And, more specifically, Defendant had a duty to warn of the risk of severe injury beyond bruises, welts, and scrapes, which is a "risk[] from a recognized danger that far exceed[s] that contemplated by the ordinary consumer." *Aregood*, 904 F.3d at 482. The only protective equipment identified as "MANDATORY" in the Training Manual and in the Simunition Information Sheet was head, throat, and groin protection. *See* Training Manual 3. The Training Manual further identifies protective equipment that is "HIGHLY RECOMMENDED" as "[f]ull body covering to include the use of gloves and hard athletic-cup style groin protection" and warns that "[s]hots to exposed skin are STRONGLY DISCOURAGED." *Id.* However, there is no requirement or a warning regarding the use of elbow guards, even though Defendant markets elbow guards as an item of protective equipment. Plaintiffs also argue that Defendant had a duty to warn that the potential for an overcharge of propellant could result in an increase in kinetic energy and a greater potential for injury.

Plaintiffs have offered Mr. Nixon's expert opinion in support of this claim. In his supplemental report, Mr. Nixon opines that Defendant was aware that its product has significant wounding potential because it markets a line of protective equipment, some of which is necessary. Nixon Suppl. Report ¶ 9.9. He also opines that, because Defendant offers elbow protection, "it can be concluded that Defendant recognizes that there is a danger of injury in the region of the elbow" and that elbow protection would have prevented Plaintiff's injury. *Id.* ¶ 9.10. In his deposition, Mr. Nixon testified:

> NIXON:   I would say from everything that I've seen, it would be reasonable to say that *elbow protection should be mandatory*. I'm not sure if that answered your question or not, but . . .

| THEISEN: | Close enough. And as part of your review of documents in this case, did you review the different warnings that Simunition provided with its ammunition? |
| NIXON: | Yes. |
| THEISEN: | Do you think that those warnings were adequate? |
| NIXON: | I don't specifically recall what all those warnings were, as I sit here today, but I recall that I concluded that they should have indicated that you need to wear protection and possibly some other areas should be mandatory. So I think I concluded from that that *the warnings were inadequate*. |

Nixon Dep. 109:5–22 (emphasis added).

Defendant had a duty to warn of the potential harm of the kind that Mr. Simpson suffered. The record creates a reasonable inference that, if the proper warnings had been provided, the injury sustained by Mr. Simpson would not have occurred. The Court denies the motion for summary judgment on Plaintiffs' failure to warn claim.[2]

## D.     Unreasonably Dangerous

Finally, Defendant argues that Plaintiffs cannot show that the Simunition 9mm marking cartridges were unreasonably dangerous, as required by the IPLA. *See* Ind. Code § 34-20-2-1. "'Unreasonably dangerous', for purposes of IC 34-20, refers to any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." Ind. Code § 34-6-2-146; *see also Weigle*, 729 F.3d at 735. The requirement that the product be "unreasonably dangerous" focuses on the reasonable expectations of the consumer and is usually a question of fact that must be resolved by the jury. *Baker v. Heye-America*, 799 N.E.2d 1135, 1140 (Ind. Ct. App. 2003); *see also Heritage Operating, L.P.*, 37 N.E.3d at 523.

---

[2] In its reply brief, Defendant argues that there is no causal link between the defect and the injury in this case. Reply Br. 7, ECF No. 42. Because Defendant raised this argument for the first time in its reply brief, the argument is waived for purposes of summary judgment. *See United States v. Lacy*, 813 F.3d 654, 658 (7th Cir. 2016).

Defendant argues that the Simunition 9mm marking cartridge is not unreasonably dangerous because the ordinary user is "aware of the danger that a projectile fired from a gun could hit a person and cause serious injury." Def.'s Br. Supp. Summ. J. 20. Defendant also argues in the context of the failure to warn claim that it had no duty to warn Mr. Simpson of open and obvious dangers and had no duty to warn just because a product might conceivably cause injury. *Id.* 16–17 (citing *Burton v. L. O. Smith Foundry Prods. Co.*, 529 F.2d 108, 111 (7th Cir. 1976); *Am. Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 187 (Ind. 1983)).

The testimony of both Mr. Simpson and Mr. Nixon supports a reasonable jury finding that the Simunition 9mm marking cartridge was unreasonably dangerous based on the dangers known to the community of persons using the product. Mr. Simpson was aware, as an ordinary user, that the Simunition 9mm marking cartridges could cause welts and bruises based on his experience during many training experiences using Simunition 9mm marking cartridges. There is no evidence that it was obvious to the ordinary user that an impact could cause serious injury or cause partial disability or impairment when the user is wearing the mandatory protective equipment.

Mr. Nixon testified that "the Simunition round can cause injury, even if it's manufactured to specification." Nixon Dep. 97:3–5. And, Mr. Nixon agreed that "even at the specified range of kinetic energy, there is certainly an understanding that some injury could occur." *Id.* 97:14–16. However, there is no evidence that the injury of a detached tricep is the type of injury known to the community of users of the Simunition 9mm marking cartridges. A detached tricep is a different kind of injury from the bruises, scrapes, and welts warned of in the written materials and is not simply a difference of degree of injury as argued by Defendant. *But see Moss*, 945 F. Supp. at 1182 (holding, in relation to the risk of penetration by a BB from an air gun, that "the

difference between the risk of being hit with a BB and it causing serious eye damage and the risk of being hit with a BB and it causing death is a difference of degree and not of kind"); *Anderson*, 67 F.3d at 625 (holding that the difference between an electrical shock and electrocution is one of degree in relation to an electrician, who knew that the crane bucket he was working in was not grounded, was electrocuted).

Defendant wrongly equates the potential dangers of Simunition 9mm marking cartridges with those of "a round fired out of a gun" rather than addressing the marking cartridge's purpose of simulating real live ammunition without the associated risks. *See* Def.'s Mem. Supp. Summ. J. 17. Unlike the BB gun in *Moss*, which is not meant to be shot at another individual, the purpose of the Simunition 9mm marking cartridges is to be fired at and make contact with other individuals without seriously injuring them. The purpose of the 9mm marking cartridge is to simulate real live ammunition for training such as "reality-based, force-on-force interactive scenarios." *See* Simunition Information Sheet. As discussed above, elbow protection was not required, yet head, throat, and groin protection were required as was covering for exposed skin, suggesting to the ordinary user that the stated dangers of non-lethal bruises, welts, or scrapes are the extent of potential injury. Plaintiffs have offered sufficient evidence for the jury to determine whether the Simunition 9mm marking cartridge is unreasonably dangerous.

## E.    Common Law Loss of Consortium Claim

Because Plaintiffs' IPLA claims based on manufacturing defect and failure to warn survive, summary judgment on the derivative loss of consortium claim is not proper. *See Wortman*, 2019 WL 6329651, at *3. The Court denies the motion as to the loss of consortium claim in Count III.

## CONCLUSION

Based on the foregoing, the Court DENIES the Motion to Strike [ECF No. 43] and

GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment [ECF No.

34]. The Court grants summary judgment in favor of Defendant on Plaintiffs' design defect

claim. Remaining for trial are Plaintiffs' IPLA claims based on manufacturing defect and failure

to warn and the claim for loss of consortium in Count III.

SO ORDERED on December 19, 2019.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT